**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
**---------------------------------------------------------------------X**

In re:

Case No. 1-12-46321-ess

EMMONS-SHEEPSHEAD BAY DEVELOPMENT, LLC
Debtor.

Chapter 11

---------------------------------------------------------------------X

METROPOLITAN ESTATES, INC., ALEX DIKMAN, ALBERT WILK, derivatively on behalf of EMMONS AVENUE, LLC,

Plaintiffs,

-against-

EMMONS-SHEEPSHEAD BAY DEVELOPMENT, LLC

Defendant.

---------------------------------------------------------------------X

**COMPLAINT SEEKING (1) TO REVOKE CONFIRMATION ORDER PURSUANT TO 11 U.S.C. § 1144 AND FED. R. BANKR. P. 7001(5), BECAUSE SUCH ORDER WAS PROCURED BY FRAUD, IN DENIAL OF DUE PROCESS AND (II) TO REVOKE DEBTOR'S DISCHARGE PURSUANT TO 11 U.S.C. § 1144(2)**

Plaintiffs Metropolitan Estates, Inc., Alex Dikman, and Albert Wilk, individually and hereby file this complaint in their derivative capacity on behalf of Emmons Ave, LLC against the Debtor-Defendant Emmons-Sheepshead Bay Development, LLC, and alleges as follows:

## INTRODUCTION

1. This underlying adversary complaint is arises from the commission of a fraud upon the Court by Debtor and its principals.

2. The Debtor lied to the Court by misrepresenting the true value of Debtor's real property located at 3112 Emmons Ave, Brooklyn, New York.

3. This real property is the sole asset of the Debtor's estate and was fraudulently conveyed and is being held in a constructive trust.

4. Fraud on the Court, in turn, provides a basis for revoking an order of confirmation pursuant to 11 U.S.C. § 1144(2).

5. The Order Confirming Debtor's First Amended Chapter 11 Plan of Reorganization (Dated July 3, 2013)(the "Confirmation Order") should be revoked pursuant to 11 U.S.C. § 1144 because the Confirmation Order was procured by fraud on the part of Debtor within the meaning of 11 U.S.C. § 1144.

6. Because the Confirmation Order was procured by fraud on the part of the Debtor, Debtor's discharge under 11 U.S.C. §1144(2).

**JURISDICTION AND VENUE**

7. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334.

8. This adversary proceeding constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (J) and (L).

9. Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

10. The plaintiffs have standing to bring the Complaint, prosecute this adversary proceeding and qualifies as a party in interest for the purpose of section 1144.

**PARTIES**

11. Plaintiff Metropolitan is a corporation organizes under the laws of the State of New York, having a principal place of business at 32 Traub Drive, Southampton, Pennsylvania 18966, engaged in the business, inter alia, of providing investment funding. Alex Dikman (hereinafter referred to as "Dikman") is a principal of Metropolitan.

12. Plaintiff Wilk is a natural person and a New York real estate broker d/b/a Wilk Real Estate Ltd. with an address of 45 John Street, Suite 711, New York, New York 10038.

Wilk is also a principal of Metropolitan.

13. All references to Metropolitan herein include individual Plaintiffs Wilk and Dikman.

14. Upon information and belief, Emmons-Sheepshead Bay Development, LLC (hereinafter referred to as "Emmons-Sheepshead") is a limited liability company organized under the laws of the State of New York, and having a principal place of business at 22 Seventh Avenue, Brooklyn, New York 11217.

## **FACTUAL ALLEGATIONS**

15. On or about October of 2004, a principal of Emmons Ave, LLC (herein after "Emmons") and the Defendant principals requested additional funds from Wilk for the further development of the Premises into condominiums.

16. Emmons Ave, LLC is the predecessor owner of the Emmons Ave Property located at 3112 Emmons Ave, Brooklyn, New York.

17. The Defendant's principals eventually presented to Mr. Wilk and Mr. Dikman a written agreement (hereinafter refined to as "the 2005 Agreement") dated January 13,2005 and entitled "Amendment to the Operating Agreement for Emmons Avenue LLC" to be executed in connection with Metropolitan's provision of funding for the further development of the Premises.

18. Under the 2005 Agreement, Metropolitan was to provide Emmons with $1,500,000.00 in investment funding for use in development of the Premises. In return, Metropolitan was to receive re-payment of its $1,500,000.00 initial investment, plus an additional $1,500,000.00 in profit, for a total of$3,000,000.00, under circumstances described in greater detail herein.

19. At the time of the execution of the 2005 Agreement, there were three mortgage loans covering the Premises (hereinafter referred to collectively as "the acquisition and construction loans"). The acquisition and construction loans consisted of: (a) a loan of $6,250,000.00 (hereinafter referred to as "the acquisition loan"); (b) a loan of $14,916,742.15 (hereinafter referred to as "the building loan"); and (c) a loan of $2,433,257.85 (hereinafter referred to as "the project loan"). The approximate total of the acquisition and construction loans was $23,600,000.00.

20. Pursuant to the 2005 Agreement, as compensation for its investment of $1,500,000.00, Metropolitan was to receive payment of profit of$1,500,000.00, in addition to Emmons' re-payment to Metropolitan of its initial $1,500,000.00 of investment funding. As security for payment of that $1,500,000.00 profit, and for the return of its initial $1,500,000.00 investment, Emmons gave Metropolitan a 10% membership interest in Emmons and in the Premises, which was to be relinquished back to Emmons once Emmons re-paid the $1,500,000.00 initial investment and paid the additional $1,500,000.00 in profit to Metropolitan.

21. At the time of the execution of the 2005 Agreement, Emmons was the owner of the Premises.

22. Metropolitan fully performed its obligation under the 2005 Agreement by providing the $1,500,000.00 in investment funds to Emmons.

23. Pursuant to the 2005 Agreement, the return of Metropolitan's principal investment of $1 ,500,000.00 and the profit of $1 ,500,000.00 was to be paid to Metropolitan from the proceeds of the sales of apartment units (hereinafter referenced to as "units") at the Premises.

24. Under the 2005 Agreement, after the sum of $25,500,000.00 was paid to Commerce Bank (now TD Bank north) on the acquisition and construction loans, Metropolitan

would receive all of the proceeds of the subsequent sales of units, less up to fifteen percent (15%) of the purchase price to pay expenses. In other words, once the $25,500,000.00, was paid on the acquisition and construction loans, **all** of the proceeds of sales of units (less up to 15% to be used for expenses), would be paid to Metropolitan until its $1,500,000.00 initial investment bad been recouped.

25. Additionally, pursuant to the 2005 Agreement, Metropolitan was entitled to: (a) receive 2% of the commissions due on each sale of a unit (even prior to the bank's having been paid $25,500,000.00), which would be considered payment toward Metropolitan's $1,500,000.00 profit, and (b) after the $1,500,000.00 initial investment had been re-paid to Metropolitan, it would also be paid 10% of the proceeds of each sale of w1its. The combination of both these items was to be applied to reduce the $1,500,000.00 profit owed to Metropolitan.

26. Furthermore, pursuant to the 2005 Agreement, there was an implied understanding that the amounts owed on the acquisition and construction loans would not be modified or increased by Emmons without Metropolitan's consent

**THE 2006 MODIFICATIONS**

27. At the time of the 2005 Agreement, the acquisition and construction loans provided a "Minimum Release Price" of 85% of the gross sales price of each unit.

28. On or about November 8, 2006, Emmons and Emmons-Sheepshead executed three Mortgage Modification Agreements (hereinafter referred to as "the 2006 Mortgage Modifications"), one for each of the three acquisition and construction loans held by Commerce Bank. The 2006 Mortgage Modifications changed the minimum release price of each unit to 93% of the gross sales price of each unit.

29. The Defendants never informed Metropolitan that the 2006 Mortgage

Modifications were executed.

30. Moreover, Metropolitan never consented to the 2006 Mortgage Modifications that Defendants executed subsequent to the 2005 Agreement.

**THE 2007 MODIFICATIONS**

31. On or about February 29, 2007, Emmons executed a new mortgage agreement entitled "Supplemental Project Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing" (hereinafter referred to as "the Supplemental Project Loan") in connection with its obtaining a new loan in the amount of $275,000.00 from Commerce Bank. This increased Emmons' approximate total indebtedness to Commerce Bank from $23,600,000.00 to $23,875,000.00.

32. On or about June 27, 2007, Emmons and Emmons-Sheepshead executed a new loan with Commerce Bank in the amount of $3,895,000.00, and consolidated that loan with the supplemental project loan and the pre-existing project loan through the execution of a "Consolidation, Modification and Extension of Project Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing" (hereinafter known as "the 2007 Project Loan Modification Agreement'). The 2007 Project Loan Modification Agreement increased the amount of the project loan to $6,603,257.85, and increased the total indebtedness owed by Emmons and Emmons-Sheepshead from $23,875,000.00 to approximately $27,770,000.00.

33. Defendants never informed Metropolitan that Emmons and Emmons Sheepshead executed the Supplemental Project Loan in the amount of $275,000,00, or that they executed the new loan of$3,895,000,00, or the 2007 Project Loan Modification, which consolidated those loans with the project loan.

34. Metropolitan never consented to the Supplemental Project Loan of$275,000,00 or

the new $3,895,000,00 loan, or the 2007 Project Loan Modification that consolidated those loans with the project loan.

35. On or about June 27, 2007, Emmons and Emmons-Sheepshead also executed a new loan in the amount of $3,040,000.00, and consolidated that loan with the pre-existing building loan through an agreement entitled "Consolidation, Modification and Extension of Building Loan, Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing" (hereinafter to referred to as "the 2007 Building Loan Modification Agreement. The 2007 Building Loan Modification Agreement increased the amount of the building loan to $17,956,742.15, and further increased the total indebtedness owed by Emmons and Emmons-Sheepshead from approximately $27,770,000.00 to $30,810,000.00. Defendants never informed Metropolitan that Emmons and Emmons-Sheepshead executed the 2007 Building Loan Modification Agreement for a new loan in the amount of $3,040,000.00, which consolidated that loan with the building loan and increased the total amount due for the building loan to $17,956,742.105.

36. Metropolitan never consented to the execution of the 2007 Building Loan Modification Agreement for a new loan in the amount of $3,040,000.00 or the consolidation of that loan, which thereby increased the total amount of the building loan.

37. On or about June 27,2007, Emmons and Emmons-Sheepshead also executed a new mortgage agreement entitled "Modification and Extension of Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing" (hereinafter referenced to as "the 2007 Acquisition Loan Modification Agreement") that modified the acquisition loans to extend their term and to provide the lender, Commerce Bank, with more favorable terms.

38. Defendants never informed Metropolitan that Emmons and Emmons-Sheepshead

executed the 2007 Acquisition Loan Modification Agreement.

39. Metropolitan never consented to the execution of the 2007 Acquisition Loan Modification Agreement.

40. At the time Metropolitan, Emmons Management and Jacob Pinson entered into the 2005 Agreement, Emmons had $23,600,000 in debt. As a result of the foregoing modifications in 2007, Emmons Management and Jacob Pinson increased Emmons' indebtedness by $7,200,000 or approximately 30%. The Defendants principals rendered Emmons unable to can-yon its business in conformance with its operating agreement (as amended through the 2005 Agreement) and unable to meet its obligations. Ultimately, this led to Emmons' insolvency, payment default, and Emmons becoming a defendant in at least two foreclosure proceedings.

41. By increasing the total indebtedness of Emmons and Emmons-Sheepshead from $23,600,000.00 to $30,810,000.00, Defendants created a situation which substantially harmed Metropolitan and its principals in at least four ways. First, the increase of over $7 million in debt was done through a recorded and filed mortgage, whereas the debt owed to Metropolitan was not in that form. Accordingly, the unauthorized increase in mortgage debt greatly undermined the value of Metropolitan's interest in Emmons, and the amount which Metropolitan might ultimately receive through an assignment or other valuation of its interest. Secondly, the increase of over $7 million in mortgage debt to the acquisition and construction lender effectively postponed the date upon which Metropolitan would be re-paid its initial $1,500,000.00 investment because Emmons is obligated to pay a large percentage of the proceeds of sales of each unit to the mortgagee bank/acquisition and construction lender. Therefore, unit sales proceeds would effectively be designated to pay the bank $30,810,000.00, instead of

$25,500,000.00, before any such proceeds would be used to re-pay Metropolitan its $1,500,000.00 initial investment. Thirdly, given that there are a finite number of units at the Premises to be sold, the unauthorized and improper increase in indebtedness to the acquisition and construction lender increased the probability that Metropolitan ultimately might not be paid either its initial investment or its profit pursuant to the 2005 Agreement since the sale of a greater number of units thereafter would be devoted toward paying the bank, rather· than Metropolitan. Thus, tile increase in the indebtedness to the bank at least partially, and possibly totally eviscerated Metropolitan's investment in Emmons.

**THE UNAUTHORIZED CONVEYANCE**

42. On or about September 29,2007 Emmons conveyed the Premises to Emmons-Sheepshead.

43. Upon information and belief, Emmons received no consideration for the transfer of the Premises to Emmons-Sheepshead.

44. Upon information and belief, the transfer of the Premises was not done in the ordinary course of business.

45. Defendants never informed Metropolitan that Emmons conveyed the Premises to Emmons-Sheepshead, or that it was made for no consideration.

46. Metropolitan never consented to the conveyance of the Premises to Emmons-Sheepshead, and further never consented to the conveyance of the Premises to Emmons-Sheepshead for no consideration.

47. By causing Emmons to fraudulently transfer the Premises to Emmons-Sheepshead for no consideration and outside of the ordinary course of business, Emmons Management and Jacob Pinson caused Emmons to become an under/un-capitalized entity and unable to carry on its

business in conformance with its operating agreement (as amended through the 2005 Agreement). Eventually, in the absence of assets to meet its obligations to Metropolitan and the acquisition and construction loan lenders, this led Emmons to become insolvent and a defendant in at least two foreclosure proceedings.

**THE 2008 MODIFICATIONS**

48. On or about August 28, 2008, Emmons and Emmons-Sheepshead executed Mortgage Modification Agreements (hereinafter referred to as "the 2008 Mortgage Modifications") that modified the acquisition and construction loans to provide the lender, TD Bank, with more favorable terms.

49. Defendants never informed Metropolitan that Emmons and Emmons-Sheepshead executed the 2008 Mortgage Modification Agreements that modified the acquisition and construction loans.

50. Metropolitan never consented to the 2008 Mortgage Modifications of the acquisition and construction loans.

**DEFAULT OF LOANS**

51. Emmons Management and Jacob Pinson increased Emmons' indebtedness by $7,200,000 or approximately 30%, rendering Emmons unable to meet its obligations to creditors.

52. Upon information and belief, Emmons and Emmons-Sheepshead have been declared to be in default upon some or all of the acquisition and construction loans.

53. Upon information and belief, at least two foreclosure proceedings have been commenced by T.D. Bank, the lender of the acquisition and construction loans, against the Defendant, and Notices of Pendency indexed against the Premises, as a result of Defendants'

alleged defaults on some or all of the acquisition and construction loans. The Defendants' defaults on the acquisition and construction loans secured by mortgages on the Premises, places in jeopardy the title to the Premises itself, which is the source through which Metropolitan is to receive repayment of its investment and the profit to which it is entitled under the 2005 Agreement.

**UNDERLYING BANKRUPTCY AND CONFIRMATION**

54. The Defendant filed for chapter 11 Bankruptcy before this Court on December 30, 2012.

55. The Defendant's plan was confirmed on July 3, 2013.

56. The Defendant disclosed having real property worth $14 million on Schedule A of its voluntary petition. Specifically, the real property consisted of an apartment units collectively known as the "The Breakers at Sheepshead Bay Condominium."

57. The Breakers at Sheepshead Bay Condominium is actually worth way more than $30 million.

58. The Plaintiff's objected to the confirmation of the plan, alleging that the plan was not offered in good faith and raised concerns regarding the total amount of Defendant's indebtedness.

59. Upon information and belief, pursuant to the plan, the Defendants main principal, Jacob Pinson was personally relieved from any liability on a mortgage encumbered on his principal residence.

**COUNT 1**

**REVOCATION OF (1) CONFIRMATION ORDER AND DEBTOR'S DISCHARGE PURSUANT TO 11 U.S.C. §§ 1144 AND 114(2)**

60. Paragraphs 1 through 60 of this Complaint are incorporated into this paragraph by this reference in their entirety.

61. Had the Debtor made full, candid and complete disclosure to the Court regarding the value of the property, the Debtor would not have satisfied the requirement of 11 U.S.C. 1129.

**COUNT 2**

**THE PROPERTY WAS FRAUDULENTLY CONVEYED TO THE DEBTOR AND NOT A PROPERTY OF THE BANKRUPTCY ESTATE**

62. Paragraphs 1 through 62 of this Complaint are incorporated into this paragraph by this reference in their entirety.

63. Upon information and belief the Debtor received the property from its predecessor, Emmons Ave, LLC, which has the same principals, for no consideration and outside of the ordinary course of business.

64. The Plaintiffs have been harmed by the aforesaid fraudulent transfer of the Premises because after the conveyance, Emmons Ave, LLC defaulted on its construction and acquisition loans, a foreclosure action was commenced against Emmons and the Metropolitan's interest in the property.

65. The property being held and now sold is not a property of the estate under 11 U.S.C. § 541 as it was fraudulently conveyed and is being held in a constructive trust.

66. A plan could not have been confirmed where the sole asset that supports the plan was not part of the bankruptcy estate.

67. The plan did not confirm with New York State law as the Debtor has no right over the property

68. Wherefore, the confirmation of the plan should be revoked. The plan did not comport with nonbankruptcy laws

**COUNT 3**

**THE PLAN VIOLATED ABOSULTE PRIORTY RULE**

69. Paragraphs 1 through 69 of this Complaint are incorporated into this paragraph by this reference in their entirety.

70. The plan violated absolute priority rule as the principal of the debtor was benefitted for support of the plan.

71. The plan did not benefit any unsecured creditors. The plan only benefitted the hard money lender, the counsels and principal of the Debtor.

72. These three participants in the bankruptcy confirmation process acted in cohorts to abuse the process of the Court for their own self benefits and thus they collectively and collusively acted in concert to mislead this court.

73. No books, records of the debtor were explained or disclosed. Absolutely no information was given to the creditors or any parties in interest.

74. The entire process was shrouded in secrecy and it resulted in abuse of process.

75. The properties were to be sold as per the plan, however suddenly upon filing of protest and motion to vacate the sale, the properties were, upon information and belief sold. No bidding took place, the property did not get the market price. The property was not exposed to the market.

76. Upon information and belief the debtor's principals before and now are still the same personalities, only names have changed.

77. The plaintiffs were defrauded, court was misled. The professionals involved with confirmation of the plan etc. and now attempting to take it away from the purview of the bankruptcy court or creditors, acted proactively to deny due process to the plaintiff. Court process was abused with assurances of nothing but that Emperor's new clothes. Whole bankruptcy process amounted to nothing but a sham.

Wherefore it is requested that the Order confirming the Chapter 11 Plan be revoked.

Dated: New York New York
January 6, 2014

/s/ Karamvir Dahiya
______________________________
Karamvir Dahiya, Esq. for the Plaintiff