UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In re:

**EMMONS-SHEEPSHEAD BAY
DEVELOPMENT LLC,**                          Chapter 11
                                            Case No.:  1-12-46321

                Debtor


------------------------------------------------------------------X

**METROPOLITAN ESTATES, INC.,
ALEX DIKMAN,
ALBERT WILK d/b/a WILK REAL ESTATE, LTD.,
and METROPOLITAN ESTATES, INC., ALEX
DIKMAN, and ALBERT WILK
 derivatively on behalf of EMMONS
AVENUE, LLC**

                **Plaintiffs,**


vs.                                                    Adversary No. 14-01003


**EMMONS-SHEEPSHEAD BAY
DEVELOPMENT LLC**
                **Defendant.**
-----------------------------------------------------------------------X

**AMENDED COMPLAINT SEEKING (I) TO REVOKE CONFIRMATION ORDER
(ECF. NO. 117), PURSUANT TO 11 U.S.C. § 1144 AND FED. R. BANKR. P. 7001(5),
BECAUSE SUCH  ORDER WAS PROCURED BY FRAUD AND (II) TO REVOKE
DEBTOR'S  DISCHARGE PURSUANT TO 11 U.S.C. § 1144(2) AND IN VIOLATION OF
DUE PROCESS AND LACK OF CANDOR ON BEHALF OF THE DEBTOR.**


Plaintiffs Metropolitan Estates, Inc. (hereinafter referred to as "Metropolitan"), Alex Dikman,

and Albert Wilk d/b/a Wilk Real Estate Ltd. (hereinafter referred to as "Wilk"), on behalf of

themselves and derivatively on behalf of Defendant Emmons Avenue, LLC, by and through their

attorney, Karamvir Dahiya of Dahiya Law Offices LLC, complaining of the above-named

Defendant Debtor, hereby allege as follows:

## THE PARTIES

1.      Plaintiff Metropolitan is a corporation organized under the laws of the State of New York, having a principal place of business at 32 Traub Drive, Southampton, Pennsylvania 18966, engaged in the business, inter alia, of providing investment funding. Alex Dikman (hereinafter referred to as "Dikman") is a principal of Metropolitan.

2.      Plaintiff Wilk is a natural person and a New York real estate broker d/b/a Wilk Real Estate Ltd. with an address of 45 John Street, Suite 711, New York, New York 10038.  Wilk is also a principal of Metropolitan.

3.      All references to Metropolitan herein include individual Plaintiffs Wilk and Dikman.

4.      Plaintiff, Emmons Avenue, LLC (hereinafter referred to as "Emmons") is a New York limited liability company having a principal place of business at 1328 President S1., Brooklyn, New York. Plaintiff Metropolitan is a member of Emmons, with a ten (l0) percent ownership interest in the same.

5.       Emmons formerly was the owner of real property  and improvements thereon located at 3112 Emmons Avenue, Brooklyn, New York, and further described as Section 26, Block 8815, Lots 1001-1147 (f/k/a Lot 86) on the Tax Map of the Borough of Brooklyn, City of New York (hereinafter referred to as "the Premises"). The Premises are more commonly known as "The Breakers at Sheepshead Bay Condominium". Plaintiff Metropolitan had a ten (10) percent ownership interest in the Premises.

6.      Upon information and belief, the Premises was the only asset owned by Emmons, and its ownership, management, operation, and development was the sole purpose of Emmons as a limited liability company.

7.      Emmons Avenue Management, LLC (hereinafter referred to as "Emmons Management"), is a New York limited liability company having a principal place of business at 1328 President

S1., Brooklyn, New York 11213. Upon information and belief, Emmons Management is and was at all times mentioned here under the Managing Member of Emmons.

8. Upon information and belief, Emmons-Sheepshead Bay Development, LLC (hereinafter referred to as "Emmons-Sheepshead" or "Debtor") is a limited liability company organized under the laws of the State of New York, and having a principal place of business at 22 Seventh Avenue, Brooklyn, New York 11217.  Emmons-Sheed is the debtor herein. Jacob Pinson aka Yakov Pinson is a member of Emmons-Sheepshead.  Debtor was,  prior to and in bankruptcy proceeding was controlled, managed and operated by Defendant Jacob Pinson aka Yakov Pinson.

9. Upon information and belief, Defendant Jacob Pinson aka Yakov Pinson (hereinafter referred to as "Jacob Pinson") is a natural person who resides at 1328 President Street, Brooklyn New York 11213, and has a place of business at 1328 President Street, Brooklyn, New York 11213-4238.   Upon information and belief, Jacob Pinson is and was, and at all times mentioned herein, a Manager and a member of Emmons Management.

## JURISDICTION

10.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334.

11.     This adversary proceeding constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (J) and (L).

12.     Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

13.     To the extent it jurisdiction relates to non core aspect of the case, the Plaintiffs consents to entry of final orders or judgment by the bankruptcy judge if it is determined that the ankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## THE JANUARY 13, 2005 AGREEMENT

14.     On or about October of 2004, Norman Pinson, brother of Jacob Pinson, Managing member of the company that owned the Debtor, requested additional funds from Wilk for the further development of the Premises into condominiums.

15.     Subsequently, meetings and negotiations ensued between Norman Pinson of Emmons, and Wilk and Dikman of Metropolitan, with Jacob Pinson and an individual named Avrohum Pinson also participating in those meetings.

16.     Norman Pinson, Jacob Pinson and Avrohum Pinson eventually presented to Mr. Wilk and Mr. Dikman a written agreement (hereinafter referred to as "the 2005 Agreement") dated January 13,2005 and entitled "Amendment to the Operating Agreement for Emmons Avenue LLC" to be executed in connection with Metropolitan's provision of funding for the further development of the Premises. Under the 2005 Agreement, Metropolitan was to provide Emmons with $1,500,000.00 in investment funding for use in development of the Premises. In return, Metropolitan was to receive re-payment of its $1,500,000.00 initial investment, plus an additional $1,500,000.00 in profit, for a total of $3,000,000.00, under circumstances described in greater detail herein.

17.     The 2005 Agreement was duly executed by Metropolitan, and was also executed by Emmons, Emmons Management and Jacob Pinson on or about January 13,2005.

18.     At the time of the execution of the 2005 Agreement, there were three mortgage loans covering the Premises (hereinafter refered to collectively as "the acquisition and construction loans"). The acquisition and construction loans consisted of: (a) a loan of $6,250,000.00 (hereinafter referred to as "the acquisition loan"); (b) a loan of $14,916,742.15 (hereinafter referred to as "the building loan"); and (c) a loan of $2,433,257.85 (hereinafter referred to as "the project loan"). The approximate total of the acquisition and construction loans was $23,600,000.00.

19.     Pursuant to the 2005 Agreement, as compensation for its investment of $1,500,000.00, Metropolitan was to receive payment of profit of$1,500,000.00, in addition to Emmons' re-

payment to Metropolitan of its initial $1,500,000.00 of investment funding. As security for payment of that $1,500,000.00 profit, and for the return of its initial $1,500,000.00 investment, Emmons gave Metropolitan a 10% membership interest in Emmons and in the Premises, which was to be relinquished back to Emmons once Emmons re-paid the $1,500,000.00 initial investment and paid the additional $1,500,000.00 in profit to Metropolitan.

20.    The 2005 Agreement also represented an agreement whereby Jacob Pinson agreed to be personally liable for payment of the amount therein to Metropolitan, according to its terms.

21.    The 2005 Agreement, as between Emmons Management and Metropolitan, also represented an agreement whereby Emmons Management agreed to be liable for payment of the amount therein to Metropolitan, according to its terms.

22.    At the time of the execution of the 2005 Agreement, Emmons was the owner of the premises.

23.    Metropolitan fully performed its obligation under the 2005 Agreement by providing the $1,500,000.00 in investment funds to Emmons.

24.    Pursuant to the 2005 Agreement, the return of Metropolitan's principal investment of $1,500,000.00 and the profit of $1,500,000.00 was to be paid to Metropolitan from the proceeds of the sales of apartment units (hereinafter referred to as "units") at the Premises.

25.    Under the 2005 Agreement, after the sum of $25,500,000.00 was paid to Commerce Bank (now TD Bank) on the acquisition and construction loans, Metropolitan would receive all of the proceeds of the subsequent sales of units, less up to fifteen percent (15%) of the purchase price to pay expenses. In other words, once the $25,500,000.00, was paid on the acquisition and construction loans, all of the proceeds of sales of units (less up to 15% to be used for expenses), would be paid to Metropolitan until its $1,500,000.00 initial investment bad been recouped.

26.    Additionally, pursuant to the 2005 Agreement, Metropolitan was entitled to: (a) receive 2% of the commissions due on each sale of a unit (even prior to the bank's having been paid $25,500,000.00), which would be considered payment toward Metropolitan's $1,500,000.00 profit, and (b) after the $1,500,000.00 initial investment had been re-paid to Metropolitan, it would also be paid 10% of the proceeds of each sale of w1its. The combination of both these items was to be applied to reduce the $1,500,000.00 profit owed to Metropolitan.

27.    Furthermore, pursuant to the 2005 Agreement, there was an implied understanding that the amounts owed on the acquisition and construction loans would not be modified or increased by Emmons without Metropolitan's consent.

## THE 2006 MODIFICATIONS

28.    At the time of the 2005 Agreement, the acquisition and construction loans provided a "Minimum Release Price" of 85% of the gross sales price of each unit.

29. On or about November 8, 2006, Emmons and Emmons-Sheepshead executed three Mortgage Modification Agreements (hereinafter referred to as "the 2006 Mortgage Modifications"), one for each of the three acquisition and construction loans held by Commerce Bank. The 2006 Mortgage Modifications changed the minimum release price of each unit to 93% of the gross sales price of each unit. Copies of the 2006.

30. The Defendants never informed Metropolitan that the 2006 Mortgage Modifications were executed.

31.    Moreover, Metropolitan never consented to the 2006 Mortgage Modifications that defendants executed subsequent to the 2005 Agreement.

## THE 2007 MODIFICATIONS

32.    On or about February 29, 2007, Emmons executed a new mortgage agreement entitled "Supplemental Project Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing" (hereinafter referred to as "the Supplemental Project Loan") in connection

with its obtaining a new loan in the amount of $275,000.00 from Commerce Bank. This increased Emmons' approximate total indebtedness to Commerce Bank from $23,600,000.00 to 23,875,000.00.

33.      On or about June 27, 2007, Emmons and Emmons-Sheepshead executed a new loan with Commerce Bank in the amount of $3,895,000.00, and consolidated that loan with the supplemental project loan and the pre-existing project loan through the execution of a "Consolidation, Modification and Extension of Project Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing" (hereinafter known as "the 2007 Project Loan Modification Agreement'). A copy of the 2007 Project Loan Modification Agreement is annexed hereto as **Exhibit** C and incorporated by reference herein. The 2007 Project Loan Modification Agreement increased the amount of the project loan to $6,603,257.85, and increased the total indebtedness owed by Emmons and Emmons-Sheepshead from $23,875,000.00 to approximately $27,770,000.00.

33.      Defendants never informed Metropolitan that Emmons and Emmons Sheepshead executed the Supplemental Project Loan in the amount of $275,000,00, or that they executed the new loan of $3,895,000,00, or the 2007 Project Loan Modification, which consolidated those loans with the project loan,

34.      Metropolitan never consented to the Supplemental Project Loan of$275,000,00 or the new $3,895,000,00 loan, or the 2007 Project Loan Modification that consolidated those loans with the project loan.

35.      On or about June 27, 2007, Emmons and Emmons-Sheepshead also executed a new loan in the amount of $3,040,000,00, and consolidated that loan with the pre-existing building loan through an agreement entitled "Consolidation, Modification and Extension of Building Loan, Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing" (hereinafter to referred to as "the 2007 Building Loan Modification Agreement"). The 2007 Building Loan Modification Agreement increased the amount of the building loan to $17,956,742,15, and

further increased the total indebtedness owed by Emmons and Emmons-Sheepshead from approximately \$27,770,000,00 to \$30,810,000,00,

36.    Jacon Pinson, in control, never informed Metropolitan that Emmons and Emmons-Sheepshead executed the 2007 Building Loan Modification Agreement for a new loan in the amount of \$3,040,000,00, which consolidated that loan with the building loan and increased the total amount due for the building loan to \$17,956,742,15.

37.    Metropolitan never consented to the execution of the 2007 Building Loan Modification Agreement for a new loan in the amount of \$3,040,000.00 or the consolidation of that loan, which thereby increased the total amount of the building loan.

38.    On or about June 27,2007, Emmons and Emmons-Sheepshead also executed a new mortgage agreement entitled "Modification and Extension of mortgage  Assignment of Leases and Rents, Security Agreement and Fixture Filing" (hereinafter referred to as "the 2007 Acquisition Loan Modification Agreement") that modified the acquisition loans to extend their term and to provide the lender, Commerce Bank, with more favorable terms. A copy of the 2007 Acquisition Loan Modification Agreement is annexed hereto as **Exhibit** E and incorporated by reference herein.

39.    Jacob Pinson never informed Metropolitan that Emmons and Emmons-Sheepshead executed the 2007 Acquisition Loan Modification Agreement.

40.    Metropolitan never consented to the execution of the 2007 Acquisition Loan Modification Agreement.

41.    At the time Metropolitan, Emmons Management and Jacob Pinson entered into the 2005 Agreement, Emmons had \$23,600,000 in debt. As a result of the foregoing modifications in 2007, Emmons Management and Jacob Pinson increased Emmons' indebtedness by \$7,200,000 or approximately 30%. As a result, Emmons Management and Jacob Pinson rendered Emmons unable to can-yon its business in conformance with its operating agreement (as amended through the 2005 Agreement) and unable to meet its obligations. Ultimately, this led to Emmons'

insolvency, payment default, and Emmons becoming a defendant in at least two foreclosure proceedings.

42.    By increasing the total indebtedness of Emmons and Emmons-Sheepshead from $23,600,000.00 to $30,810,000.00, Jacob Pinson, created a situation which substantially harmed Metropolitan and its principals in at least four ways. First, the increase of over $7 million in debt was done through a recorded and filed mortgage, whereas the debt owed to Metropolitan was not in that form. Accordingly, the unauthorized increase in mortgage debt greatly undermined the value of Metropolitan's interest in Emmons, and the amount which Metropolitan might ultimately receive through an assignment or other valuation of its interest. Secondly, the increase of over $7 million in mortgage debt to the acquisition and construction lender effectively postponed the date upon which Metropolitan would be re-paid its initial $1,500,000.00 investment because Emmons is obligated to pay a large percentage of the proceeds of sales of each unit to the mortgagee bank/acquisition and construction lender. Therefore, unit sales proceeds would effectively be designated to pay the bank $30,810,000.00, instead of $25,500,000.00, before any such proceeds would be used to re-pay Metropolitan its $1,500,000.00 initial investment. Thirdly, given that there are a finite number of units at the Premises to be sold, the unauthorized and improper increase in indebtedness to the acquisition and construction lender increased the probability that Metropolitan ultimately might not be paid either its initial investment or its profit pursuant to the 2005 Agreement since the sale of a greater number of units thereafter would be devoted toward paying the bank, rather· than Metropolitan.  Thus, tile increase in the indebtedness to the bank at least partially, and possibly totally,  eviscerated Metropolitan's investment in Emmons.

## THE UNAUTHORIZED CONVEYANCE

43.    On or about September 29, 2007 Emmons conveyed the Premises to Emmons-Sheepshead, the debtor herein.

44.    Upon information and belief, Emmons received no consideration for the transfer of the Premises to Emmons-Sheepshead.

45.     Upon information and belief, the transfer of the Premises was not done in the ordinary course of business.

46.     Defendants never informed Metropolitan that Emmons conveyed the Premises to Emmons-Sheepshead, or that it was made for no consideration.

47.     Metropolitan never consented to the conveyance of the Premises to Emmons-Sheepshead, and further never consented to the conveyance of the Premises to Emmons sheepshead for no consideration.

48.     By causing Emmons to fraudulently transfer the Premises to Emmons-Sheepshead for no consideration and outside of the ordinary course of business, Emmons Management and Jacob Pinson caused Emmons to become an under/un-capitalized entity and unable to carry on its business in conformance with its operating agreement (as amended through the 2005 agreement). Eventually, in the absence of assets to meet its obligations to Metropolitan and the acquisition and construction loan lenders, this led Emmons to become insolvent and a defendant in at least two foreclosure proceedings.

### THE 2008 MODIFICATIONS

49.     On or about August 28, 2008, Emmons and Emmons-Sheepshead executed Mortgage Modification Agreements (hereinafter referred to as "the 2008 Mortgage Modifications") that modified the acquisition and construction loans to provide the lender, TD Bank, with more favorable terms.

50.     Defendants never informed Metropolitan that Emmons and Emmons-Sheepshead executed the 2008 Mortgage Modification Agreements that modified the acquisition and construction loans.

51.     Metropolitan never consented to the 2008 Mortgage Modifications of the acquisition and construction loans.

## DEFAULT OF LOANS

52.      Emmons Management and Jacob Pinson increased Emmons' indebtedness by $7,200,000 or approximately 30%, rendering Emmons unable to meet its obligations to creditors.

53.      Upon information and belief, Emmons and Emmons-Sheepshead were declared to be in default upon some or all of the acquisition and construction loans.

54.      Upon information and belief, at least two foreclosure proceedings were commenced by T.D. Bank, the lender of the acquisition and construction loans, against Emmons and debtor, and Notices of Pendency indexed against the Premises, as a result of Defendants' alleged defaults on some or all of the acquisition and construction loans. The Defendants' defaults on the acquisition and construction loans secured by mortgages on the Premises, placed in jeopardy the title to the Premises itself, which was the source through which Metropolitan was to receive repayment of its investment and the profit to which it is entitled under the 2005 Agreement.

## FAILURE TO ACCOUNT

55.      On May 12, 2011, Metropolitan's attorneys issued a letter to Emmons and Jacob Pinson, demanding access to Emmons' books and records and expressing concern that Emmons was violating the 2005 Agreement, and they followed up with e-mail and telephone communications to Defendants' attorney. However, those communications were ignored.

56. On June 20, 2011, Metropolitan's attorneys issued a letter to Emmons and Jacob Pinson, demanding information and documentation from Emmons that Metropolitan is entitled to receive pursuant to the Limited Liability Company Law though correspondence dated August 5,2011, Defendant Emmons' and Defendant Jacob Pinson's attorney refused to disclose to, Metropolitan's attorneys all of the demanded information and documentation that Metropolitan is entitled to receive. Defendants and their counsel have repeatedly refused to disclose the financial documentation and information demanded by Metropolitan pursuant to the Limited Liability Company Law.

57.    Defendants Emmon and Jacob Pinson had refused to completely disclose all of the information and documentation that Metropolitan was and is entitled to receive under the Limited Liability Company Law, despite demands from Metropolitan for the same. In light of the fact that Defendant's acts set forth in the causes of action herein below were, in fact, essentially the acts of Jacob Pinson or vice versa, who was the Managing Member of Emmons Management, which is the managing and controlling member of Emmons, and the debtor through various schematic agencies, Mr. Pinson displayed disregard for the laws and abused the process of the courts for one maneuver or the other, preventing the emergence of truth and his accountability.

58.    The Plaintiffs commenced a proceeding against the debtor and including Emmons Avenue, LLC, Emmons Avenue Management, LLC, Jacob Pinson, Avrohum Pinson, Norman Pinson and one Moti Pinson  (State Court Defendants) with the New York Supreme Court, Kings County.

59.    The State Court defendants moved for granting of summary judgment and cancellation Notice of Pendency filed by plaintiffs against the transferred property on August 29, 2011.  This request was denied after the court found indicia of fraudulent intent by state defendants; a close relationship between Jacob Pinson, Emmons, Emmons Management, property was transferred without any consideration to Emmons Sheepshead/Debtor for no consideration and counsel for the parties were directed to appear in the Central Compliance Part on October 1, 2012.

60.    Jacob Pinson in furtherance of his scheme of not accounting to the plaintiff and defeat the state court judgment immediately sought bankruptcy protection on August 30, 2012 under Chapter 11 with this Court, for Emmons-Sheepshead prior to the Schedule October1, 2012 date. Filing of this bankruptcy stopped proceeding against the debtor, the transferee of fraudulently conveyed property.

61.    It was in the bankruptcy petition that Jacob Pinson reflected himself as the managing member of the Yachad Enterprises LLC the managing member of the Debtor company.

62.     Jacob Pinson through his counselors, Robinson, Brog, Leinwand, Greene, Genovene & Gluck P.C. (Brog), listed the debtor property value as $14 million with a secured claim of $31,107,639.71.

63.     On February 28, 2013, Alla Kachan appearing for the plaintiffs filed a motion for examination of the debtor and its officers, books and records related thereto under Bankruptcy Rule 2004 Examination.  Ms. Kachan argued that it was necessary to have discovery in this matter to obtain detailed information regarding the Debtor's assets, conduct of business, unauthorized modification of  mortgages and fraudulent transfers.  Also sought was accounting and disclosure from TD Bank for the final figures of indebtedness. Ms. Kachan wanted transparency about assets and numbers involved regarding business transactions leading to the filing of the bankruptcy.  Several documents were requested. Ex.

64.     On February, 28, 2013, Ms. Kachan also filed objection to the Disclosure Statement as submitted by the Debtor for approval. The plaintiff raised the objection regarding feasibility of the plan as well as the continued management by Jacob Pinson.  The Plaintiff objected to the provision of the plan with had proposed compensation to Jacob Pinson of $700,000 while plaintiff standing to receive less than $100,000. Plaintiff also challenged the Disclosure Statement as inadequate for there were serious allegation of fraudulent assignments and conveyances, undisclosed disbursement and siphoning of funds which pertained to the integrity of the bankruptcy system.

65.     On March 11, 2013, Debtor without providing any benefit of any demanded discovery or information  filed motion to expunge the claims of the Plaintiffs to which plaintiff objected on April 8, 2013,  stating that "information crucial to the claims . .. is sought to be obtained in the course of the earlier requested 2004 examinations, in which the U.S. Trustee's Offices has expressed an interest in participating."

66.     Debtor on April 5, 2013, objected to the Rule 2004 Examination arguing that " the disputes between Metropolitan, Wilk and Dikman and the Debtor are contested matters and as such the 2004 Motion is inappropriate and must be denied." Further, "[a]ny discovery that is to take place must be governed by Part VII of the Federal Rule of Bankruptcy Procedure which incorporates the Federal Rules of Civil Procedure."   Also, the Debtor through its counsel also objected to requested discovery

under Rule 2004 alleging that, " they are vague, overly broad, ambiguous and confusing." Further in order to defeat disclosure, the debtor's counsel miscreated a phantom barrier arguing that " Metropolitan, Wilk and Dikman are using the broad authority of a Rule 2004 examination to obtain information to use in the State Court Action."   This was done suppressing the material fact that instant bankruptcy was filed to defeat the emergence of truth and purge the company for fraudulent conveyance liabilities.

67.     Debtor proposed a second Amended Plan asking for immunity to any or all claims against the debtor or its business and compensation for Jacob Pinson for $10,000 per month, per a proposed spurious consulting  agreement along with other characteristics which were opposed by the plaintiff on April 11, 2013. It was also objected because the plaintiff did not have adequate information regarding the estate and the basis of all what was projected for in the Disclosure Statement and treated in Amended Plan.

68.     On April 11, 2013, the plaintiffs filed an amended Notice of Motion for 2004 Examination and "requesting an extension of time to reject the Debtor's Plan of Reorganization," as there was a total secrecy about the basis of the numbers regarding liability and assets of the debtor and also contentions of the debtor regarding the creditors. The plaintiff through their counsel stated the following:

> Metropolitan, by their attorney, Alia Kachan, believe that it is necessary for them to conduct discovery in this matter to obtain detailed information regarding the Debtor's assets. conduct of business, unauthorized modifications of mortgages and a potentially fraudulent transfer which effectively eviscerated Metropolitan's interests. Specifically, Metropolitan, by their attorney, Alia Kachan, will investigate the Debtor's finances surrounding the operation of his business, its' use of the funds received from Metropolitan, the activities that resulted in Emmons insolvency, payment default and subsequent foreclosure proceedings. Further more, an examination of the financial transactions involving both Emmons and the Debtor, are necessary as they seem to have been controlled at least in part by the same principal, Jacob Pinson and both entities jointly executed the various loan modification documents and the subsequent no consideration transfer of the Premises. Moreover, Metropolitan will seek an accounting and disclosure from TD Bank N.A. of how the final figures of indebtedness were arrived at. Similarly, as demonstrated in Exhibit A annexed hereto, the documents sought by Metropolitan relate to efforts verify the Debtor's assets, and examine the financial business transactions conducted at the

time of the various unauthorized loan modifications that may have directly affected Metropolitan's interest. It appears that Alexander Lokshin, was a party present at every closing of title and received funds from every transaction for supposed  services rendered. No contract as to these services is known to Metropolitan or has been known to exist. Atorney David Frankel, in as much as the information requested is not privileged, was present at the closing and is aware of the payments from each closing made to Alexander Lokshin. Additionally, it is the contention of Metropolitan, that closing statements presented at the time of the closings differ from the closing statements presented as exhibits in the Debtor's Motion to Reduce or Expunge claims.

69.    On April 11, 2013, the Court directed the parties to submit stipulation and propose order as to discovery by April 18, 2013.  On April 26, 2013, the Court passed a Scheduling Order that,  the parties shall serve their respective notices of deposition or notice of 2004 examination, whichever is appropriate, on or before June 21, 2013.

70 .    In and around June 18,  2013, the Plaintiff's counsel wrote the following letter to the Court regarding settlement progress with the debtor's counsel:

In light of your instructions issued to all parties during our first settlement conference on Monday, June 10, 2013, an offer was to be presented by Debtors and the bank's counsel with regard to payments to Wilk and Metropolitan as creditors as well as an offer for an exclusive brokerage agreement to Wilk Realty as a broker. In e-mail and phone discussions with counsel for the debtor in the course of the past week, we have made several requests for a written offer of terms. The response received was for the purpose of scheduling the continuing conference only, with no terms being discussed or proposed. Late in the week, Mr. Greene contacted us by phone putting forth some tentative terms over the phone. He subsequently responded to a request for a written offer by stating that a written proposal will only be issued when the terms are accepted. No brokerage agreement offer has been made to date. It must be noted that Mr. Wilk provided all of the requested credentials the day after the first settlement conference. We respectfully submit, **that while counsel for the debtor, forcefully push for confirmation, the time provided by the court to make meaningful headway in the negotiation process is not being utilized for that purpose, regardless of our continued efforts to do so.** We further respectfully submit that in light of numerous previous oral offers and discussions that were quite different over time, Wilk and Metropolitan have requested a solid written offer of terms which can  be discussed and to which counter proposals may be submitted.

71.    The Debtor and its counsels, Brog, without providing any meaning opportunity to the plaintiffs and their demands either in terms of information or good faith efforts continued to mislead (stitching emperor's new clothes) the plaintiffs and her counsel.

72.    On June 18, 2013, the Plaintiffs' through their counsel wrote to the Court:

Dear Honorable Judge Stong:

Please be advised that the Debtor submitted a settlement offer which substantially departed from earlier settlement discussions, on Wednesday, June 19, 2013. By Friday, June 21, 2013, as mandated by the court, a counter offer was submitted by the debtors. No response has been forthcoming. Today, June 24, 2013, the debtor's filed a balloting agent's certification of acceptances and rejections of second amended plan of reorganization of Emmons Sheepshead Bay Development, and served a Deposition Demand of Alexander Dikman. It is hereby respectfully noted, that due to the ongoing settlement discussions, the discovery process which is essential to Metropolitan's and Wilk's vote on the plan, had effectively been halted. While the discovery responses received by our clients were deficient, we had faith that the settlement discussions will be fruitful and therefore did not file a Motion to Compel Discovery or issue further discovery and deposition notices at the time. As it is now apparent that the Debtor had merely hoped to win a tactical time advantage and is not going forward with the settlement negotiations, my clients respectfully request a brief extension of time in order to submit a Motion to Compel Discovery, a ballot rejecting the plan and further discovery and deposition notices. We regret that we have not been able to reach a settlement with the debtor that would result in judicial economy. We however respectfully posit, that my clients should not be penalized for taking the time to  attempt to settle the matter without a costly judicial process. The discovery requested and to be requested is seeking to produce information that is critical to understanding the validity of the secured claim figures, the validity of the Breakers property transfer to the debtor, the presence of fraud in the administration of our clients' funds as well as funds received at closing as well as the management of Emmons Ave. LLC., in which my clients hold an equity interest. Furthermore, there appears to be documentation which has come to light, the explanation of which has been requested of the Debtor and no explanation has been received to date, which seems to suggest the Debtor's intentional failure to report the accurate sales price, of which a percentage was then to be paid to our clients in accordance with the agreements, with regard to at least one closing of tide. For the foregoing reasons, the tentative confirmation date of the plan is premature and we respectfully request additional time to obtain

discovery in order to have the ab'llity to make an informed decision on confirmation.

73.    To the preceding letter by the Plaintiffs counsel, the debtor's counsel Brog filed the following response:

> At all times during these settlement discussions, the Debtor has acted in good faith in an  attempt to reach an agreement with Ms. Kachan and her client. The Debtor has been clear that it was moving toward confirmation of its Plan even while settlement discussions were pending. The Debtor is faced with stay relief and the strong possibility that if it does not confirm a Plan shortly, it will be faced with a State Court foreclosure which will wipe out any payments to its creditors.
> Ms. Kachan failed and neglected to respond to the Court-ordered deadlines for objections to the Debtor's Plan. The Debtor intends to move forward with confirmation as it does not believe any of Ms. Kachan's claims deal with confirmation issues. They are issues that relate to her client and allegations against the principal of the Debtor. They do not deal with feasibility, nor any requirements of Section 1129 of the Bankruptcy Code. Ms. Kachan's statements only intend to bolster her agenda of delaying confirmation in an effort to hold up the estate for more money for her client without any care or interest as to the benefit of all creditors of the Debtor's estate.
> We respectfully request that Your Honor allow the Debtor the opportunity to proceed with confirmation on Thursday, which will have no prejudicial effect on Ms. Kachan's ability to continue her pursuit of her litigation against the Principal.

74.    On June 25th, 2013, the Plaintiffs through her counsel requested extension of time to complete discovery. On June 26, 2013, the counsel for the Plaintiff made a motion to compel a response to discovery request. In this motion the plaintiff highlighted the response of the debtor's counsel regarding the discovery that had been sought. The response did not rise to any level to the adequacy of response, other than summarily dismissing all valid demands of the plaintiff, to wit: Debtor objects to this request as it is vague, ambiguous, overly broad and unduly burdensome. debtor further objects to this Interrogatory to the extent that it requests information not relevant to the subject matter of this chapter 11 proceeding and that it is not reasonably calculated to lead to the discovery of admissible evidence.

70.    On June 26, 2013, the Plaintiffs filed objection to the Confirmation of Plan.

71.     The Court confirmed the Plan on July 3, 2013.

72.     The root of Plaintiff's Complaint is the commission of a fraud upon the Court by Debtor and Jacob Pinson, its director, president, secretary, treasurer, agent, statutory insider under 11 U.S.C. § 101(31) willfully ignored by the defendants counsel.

73.     The debtor through Jacob Pinson and related parties subverted the integrity of this court by not disclosing the entire information to the plaintiff's counsel, misleading the court about the nature of the debtor's property and falsly pushing the court to have a extending hearing in the evening with a false pretense that the investors would walk away if the plan is confirmed by certain time of the day.

74.     Fraud upon the Court, in turn, provides a basis for revoking an order of confirmation pursuant to 11 U.S.C. § 1144 and revoking a reorganized debtor's discharge pursuant to 11 U.S.C. § 1144(2).

75.     The plan could not have been confirmed as the underlying property of debtor utilized as estate property for refinancing was and is not property of the debtor, as this property was one which was fraudulently conveyed from the Emmons to the debtor by Jacob Pinson. The bankruptcy process was abused to morph the character of the property is not permissible under the bankruptcy code.  The plan violated the State laws.

76.     Debtor and its officer created a false pressure on the Court that the interest of the creditors is a stake, when the only creditors that benefited was the sole secured creditors and retained counsel for the debtor.

77.     On June 27, 2013 in the hearing regarding confirmation of the second plan, Mr. Jerold Feuerstein, Esq. put pressure on the Court that the plan must be confirmed by 5 PM or the investors will back down from providing an y additional funds necessary to make improvements on the property. In support of this "urgency", the Court was told that there is some water damage

and flooding on the property and immediate action is necessary. However in fact, upon information, an inspection of the property, showed that on that day there was no water damage.

78.    In furtherance of their scheme, the debtor and its officer proactively disregarded the information sought by the plaintiff, so that they could make an informed choice in the bankruptcy process, however it was denied with one excuse or the other and the worst was dismissing all relevant discovery demands with two sentences: Debtor objects to this request as it is vague, ambiguous, overly broad and unduly burdensome. Debtor further objects to this Interrogatory to the extent that it requests information not relevant to the subject matter of this chapter 11 proceeding and that it is not reasonably calculated to lead to the discovery of admissible evidence.

79.    Debtor and its counsel proactively for one reason or other kept misleading the then debtor's counsel that they are negotiating in good faith, when in reality they wanted to push the time and get the plan confirmed as quickly as possible so that there is no informed objection.

80.    Upon information  and belief the debtor through Jacob Pinson had siphoned of the corporate debtor assets and sold the property units for higher price than what was declared in Court and thus injuriously enhancing its liability and thus preventing the creditors any benefits from those transactions.  The debtor and its officer concealed these facts of the sale of property assets prior to the filing of bankruptcy.

81.    The plan was not proposed in good faith, as the entire information provided in the petition and as disclosed in the court had no basis, nothing was transparent as no information was allowed to any of the plaintiffs despite incessant pleadings. Thus, lack of meaningful participation, owing to the debtor and his counsels deliberately avoiding disclosures resulted in substantial unfairness  and deprivation of right to challenge or hold the debtor and its officer accountable under the laws of New York State and United States. *Fuentes v. Shevin,* 407 U.S. 67, 97 (1972). Streamrolling a Chapter 11 plan for confirmation, despite knowledge that the plan is premised on property that have been fraudulently conveyed without any consideration from the plaintiffs to the debtor, resulted in unfair or at least a mistaken deprivation of the entitlements

conferred by law upon the plaintiffs. *Boddie v. Connecticut*, 401 U.S. 371, 374, (1971): Perhaps no characteristic of an organized and cohesive society is more fundamental than its erection and enforcement of a system of rules defining the various rights and duties of its members, enabling them to govern their affairs and definitely settle their difference in an orderly, predicable manner." The plaintiffs were dealt with and not talked to as is required in a legal process. Indeed, the record of this case discloses that Debtor and its counsels had undertaken affirmative steps that would have had the effect of shielding Debtors officer misconduct from this Court's scrutiny

82. The debtor listed its property valued at $14 million, however the property was once the objection to the confirmation of plan was filed was conveyed for double the amount, a fact that cannot be ignored. However the property is worth more than $30 million.

83. Upon the filing of the motion to revocation of the confirmation order, the debtor and Brog immediately moved to create a sham entity to show to show that the property is indeed being sold transferred the assets. Thus the debtor property which was supposed to stay with the debtor and sold piecemeal was immediately transferred to a new entity. However the property was not sold any bidder. There was no bidding. There was no marketing of the property to maximize the value.

84. Upon information and belief, pursuant to the plan, the Defendants main principal, Jacob Pinson was personally relieved from any liability on a mortgage encumbered on his principal residence and this is in complete violation of absolute priority rule.

85. Had Debtor and Jacob Pinson made the full, candid and complete disclosures required of them, the Court would not have confirmed Debtor's amended plan of reorganization and entered the Confirmation Order because Debtor would not have been able to carry its burden of establishing that its amended plan of reorganization satisfied the requirements of 11 U.S.C. §§ 1129(a)(1), 1129(a)(2), 1129(a)(3) and 1129(a)(5).

86.     Judged from an objective standard, Plaintiffs contends that Jacob Pinson's knowledge regarding his connections to, and dealing with, sale of the debtor's units prior to the filing of bankruptcy were material to Court's consideration of whether the sale value, was valid and formed part of the body of reasonably adequate information under 11 U.S.C. § 1125(a) that creditors would want to know in order to make an informed judgment about the merits of Debtor's amended plan of reorganization.

87.     Full disclosure of the realities of the shrinkage of assets of the debtor prior to the filing and basis of the value of the assets,  and liabilities and conduct of  Jacob Pinson and maneuvering of the plan and its subsequent change of course and then immediately exhibiting volte face creating a third entity  and transferring the assets, with no bidding to defeat the plaintiff's motion to call back the plan confirmation speaks volumes in terms of the scheme of the debtor and its officers. Had the  court known about all the facts or if the facts were made available to the plaintiffs, determination whether Debtor's  amended plan of reorganization satisfied the requirements of 11 U.S.C. §§ 1129(a)(1), 1129(a)(2), 1129(a)(3) and 1129(a)(5) would have been questionable.

## COUNT 1
## REVOCATION OF (1) CONFIRMATION ORDER AND DEBTOR'S DISCHARGE PURSUANT TO 11 U.S.C. §§ 1144 AND 114(2)

88.     Paragraphs 1 through 87 of this Complaint are incorporated into this paragraph by this reference in their entirety.

89.     Had the Debtor made full, candid and complete disclosure to the Court regarding the value of the property, the Debtor would not have satisfied the requirement of 11 U.S.C. § 1129.

## COUNT 2
## THE PROPERTY WAS FRAUDULENTLY CONVEYED TO THE DEBTOR AND NOT A PROPERTY OF THE BANKRUPTCY ESTATE

90.     Paragraphs 1 through 89 of this Complaint are incorporated into this paragraph by this reference in their entirety.

92.     Upon information and belief the Debtor received the property from its predecessor, Emmons Ave, LLC, which has the same principals, for no consideration and outside of the ordinary course of business.

93.     The Plaintiffs have been harmed by the aforesaid fraudulent transfer of the Premises because after the conveyance, Emmons Ave, LLC defaulted on its construction and acquisition loans, a foreclosure action was commenced against Emmons and the Metropolitan's interest in the property.

94.     The property being held and now sold is not a property of the estate under 11 U.S.C. § 541 as it was fraudulently conveyed and is being held in a constructive trust.

95.     A plan could not have been confirmed where the sole asset that supports the plan was not part of the bankruptcy estate.

96.     The plan did not confirm with New York State law as the Debtor has no right over the property.

97.     Wherefore, the confirmation of the plan should be revoked. The plan did not comport with nonbankruptcy laws.

## COUNT 3
## THE PLAN VIOLATED ABOSULTE PRIORTY RULE

98.      Paragraphs 1 through 97 of this Complaint are incorporated into this paragraph by this reference in their entirety.

99.     The plan violated absolute priority rule as the principal of the debtor was benefitted for support of the plan.

100.     The plan did not benefit any unsecured creditors. The plan only benefitted the hard

money lender, the counsels and principal of the Debtor.

101.    These three participants in the bankruptcy confirmation process acted in cohorts to abuse the process of the Court for their own self benefits and thus they collectively and collusively acted in concert to mislead this court.

102.    No books, records of the debtor were explained or disclosed. Absolutely no information was given to the creditors or any parties in interest.

103.    The entire process was shrouded in secrecy and it resulted in abuse of process.

104.    The properties were to be sold as per the plan, unit by unit, however suddenly upon filing of protest and motion to vacate the sale, the properties were, upon information and belief sold to a new entity, which upon information and belief is a sham. No bidding took place, the property did not get the market price. The property was not exposed to the market.

105.    Upon information and belief the debtor's principals before and now are still the same personalities, only names have changed.

106.    The plaintiffs were defrauded, court was misled. The professionals involved with confirmation of the plan etc. and now attempting to take it away from the purview of the bankruptcy court or creditors, acted proactively to deny due process to the plaintiff. Court process was abused with assurances of nothing but that Emperor's new clothes for the plaintiff. Even the Courts instruction to involve in good faith discussion were sidelined with petty excuses and misleading information.

### COUNT 4.

### THE PLAN WAS CONFIRMED IN VIOLATION OF DUE PROCESS.

107.    Paragraphs 1 through 106 of this Complaint are incorporated into this paragraph by this reference in their entirety.

108.    The Plaintiff and her counsel kept begging for information, pleaded discovery, however it was all denied with one excuse or the other. The Plaintiffs were not given any material information and the plan was confirmed without considering that the plaintiffs did not have the required information, thus they were denied the due process.

109.    For these reasons, the Confirmation Order should be revoked under 11 U.S.C. § 1144, and under the due process clause of the Constitution.

Wherefore it is request that the Order confirming the Chapter 11 Plan be revoked.

Dated: New York New York
        April 16, 2014

/s/karamvir Dahiya
_____
Karamvir Dahiya, for the Plaintiff.